UNITED STATES of America,

v.

Paul V. OATES, Defendant.

No. 72–CR–501.

United States District Court,
E. D. New York.

Feb. 6, 1978.

James H. Grant of Talbot, Grant &
McQuarrie, Detroit, Mich., for defendant.

David G. Trager, U. S. Atty. by Asst. U. S. Atty. Douglas K. Mansfield, Brooklyn, N. Y., for the United States.

## MEMORANDUM and ORDER

COSTANTINO, District Judge.

Paul V. Oates, was charged in a two count indictment with conspiring with one Isaac Daniels to possess heroin with intent to distribute it, and with aiding and abetting Daniels to possess heroin with intent to distribute it. Defendant waived his right to a jury trial and was tried by the court.[1] Before reaching a decision as to defendant's guilt or innocence, there is a preliminary matter which must be disposed of.

At the first trial of this defendant, a motion was made to suppress several items of evidence, including two packages of heroin seized from the defendant and his companion at the time of their arrest. Judge Bramwell denied the motion, and that ruling was upheld by the Court of Appeals. *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977). At the commencement of the retrial before this court, defendant moved for reconsideration of the motion to suppress on the grounds that there was newly discovered evidence not available in the hearing before Judge Bramwell and, therefore, not available to the Court of Appeals when it upheld Judge Bramwell's ruling. This court denied the motion for reconsideration, but at the close of the testimony granted the defendant leave to file a written motion. That motion is presently before the court.

In support of his motion to reconsider, defendant raises three instances of allegedly "newly discovered evidence": (1) a letter, dated March 16, 1976, from Judge Bramwell to the New York Regional Director of the Drug Enforcement Administration, commending Agent Garfield Hammonds, a case agent and a witness for the Government both at the suppression hearing and the trial before Judge Bramwell, for his investigative work in this case; (2) the testimony of William C. McMillan, a one-time informant for the Government, and a witness for the Government at the trial, who testified in his own behalf in a State Court proceeding in a manner which defendant believes tended to impeach the testimony that Agent Hammonds offered in the suppression hearing before Judge Bramwell; and (3) evidence concerning the use of metal detectors or magnetometers at LaGuardia Airport on the date defendant was arrested, which, defendant claims, impeaches the testimony of Agent Hammonds and, in so doing, shows a lack of reasonable suspicion to believe Daniels was armed and, therefore, demonstrates that there was no justification for the frisk of Daniels which uncovered the heroin involved in the case.

When the Court of Appeals affirmed Judge Bramwell's denial of the suppression motion, it established the law of the case with respect to the validity of the seizure. This court is bound by that determination, and must apply that law to this proceeding, see 1B Moore's Federal Practice, ¶ 0.404[1] at 402–403 (2d Ed. 1974), notwithstanding that a claim of newly discovered evidence has been raised. *United States v. Fernandez,* 506 F.2d 1200, 1202–03 (2d Cir. 1974); *Banco National de Cuba v. Farr,* 383 F.2d 166, 177 (2d Cir. 1967), *cert. denied,* 390 U.S. 956, 88 S.Ct. 1038, 19 L.Ed.2d 1151 (1968).

---

1. Defendant Oates and his codefendant Daniels had originally pled not guilty to both counts of the indictment. On September 12, 1972, both pled guilty to count two of the indictment and both received prison sentences. Subsequently, defendant Oates made a motion seeking to withdraw his guilty plea. The motion was granted and defendant's judgment of conviction was vacated. Defendant was then tried before the Honorable Henry Bramwell and the jury returned a verdict of guilty on both counts of the indictment. That conviction was reversed by the United States Court of Appeals for the Second Circuit on June 3, 1977, because of the failure of the Government to produce Mr. Milton Weinberg, the Customs Service chemist who had originally analyzed the white powdery substance seized from Daniels and determined it to be heroin. *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977). That defect in the original trial was remedied when Mr. Weinberg testified at the retrial before this court, to which the case had been reassigned by random selection following the reversal by the Court of Appeals.

In this case, only the Court of Appeals, which established the law of the case, may alter that law, and the appropriate procedure would have been to seek an alteration by the Court of Appeals of its mandate. *See United States v. Fernandez, supra.* Accordingly, the motion for reconsideration of the motion to suppress must be denied.

■ Assuming *arguendo* that this court were empowered to entertain the motion to reconsider the motion to suppress, it would still have to be denied on the basis that none of the "newly discovered evidence" has any significant effect on the testimony adduced at the original hearing. The defendant argues that the letter from Judge Bramwell "suggests the possibility of bias at the time the judge entered his decision on the motion to suppress." (Tr., September 26, 1977 at 16). Such an allegation is without merit. The letter from Judge Bramwell was written after the hearing, after the jury returned its verdict, after the defendant had been sentenced, and after the conviction had been appealed. There is absolutely nothing to indicate that Judge Bramwell had pre-judged the case; indeed, his opinion as to Agent Hammonds' work could only have been formed *after* he had heard the testimony in the case. Accordingly, this court cannot accept defendant's claim that the letter is an indication of possible bias on the part of Judge Bramwell.

■ In order to justify a new hearing on the suppression motion based upon the "newly discovered" testimony of McMillan and the "newly discovered" magnetometer evidence, defendant must show four things: (1) that the evidence is newly discovered and was unknown to defendant at the time of the original hearing; (2) that the evidence is material and not merely cumulative or impeaching; (3) that the new evidence will probably produce a different result in the proceedings; and (4) that the failure to learn of the evidence previously was not the result of lack of due diligence on the part of the defendant. Wright, Federal Practice and Procedure, vol. 2 § 557, at 515; 8A Moore's Federal Practice, ¶ 33.-03[1].[2] The court finds that neither item of "newly discovered" evidence meets these standards.

■ With respect to McMillan's testimony, defendant claims that it would have impeached the testimony of Agent Hammonds. However, as previously stated, impeachment evidence is not sufficient to justify a new hearing on the suppression motion. *Cf. Mesarosh v. United States,* 352 U.S. 1, 9, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956). Moreover, defendant had been given McMillan's name prior to the suppression hearing (Tr. September 28, 1977 at 94) and could have obtained the evidence he now claims is newly discovered if he had chosen to interview McMillan prior to the hearing. He did not do so, and the court concludes that the defendant did not exercise due diligence in attempting to secure the evidence prior to the hearing. *Cf. United States v. Pellegrino,* 273 F.2d 570 (2d Cir. 1960). In addition, the court cannot say that McMillan's testimony would probably have produced a different ruling by Judge Bramwell. *Cf. United States v. Soblen,* 301 F.2d 236 (2d Cir.), *cert. denied,* 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962); *United States v. Pellegrino, supra.*

The claim of newly discovered evidence with respect to the existence of magnetometers at LaGuardia Airport on the day of defendant's arrest also fails to persuade the court that a rehearing of the motion to suppress is required. The question of the

2. The four criteria enumerated above apply to motions for a new trial based on newly discovered evidence. Such motions are not favored by the courts and are viewed with great caution. *United States v. Lombardozzi,* 343 F.2d 127 (2d Cir.), *cert. denied,* 381 U.S. 938, 85 S.Ct. 1771, 14 L.Ed.2d 702 (1965); *United States v. Costello,* 255 F.2d 876, 879 (2d Cir. 1958). The underlying reason for those strict standards—namely, the orderly administration of criminal justice, *cf. United States v. Johnson,* 327 U.S. 106, 111, 66 S.Ct. 464, 90 L.Ed. 562 (1945)—applies with equal force to motions for new hearings on suppression motions based on newly discovered evidence. Accordingly, the court will measure defendant's motion against those same criteria.

presence of magnetometers was in fact raised by the Government at the suppression hearing (Tr. January 5, 1976 at 108–109), but was not pursued by the defendant. There has been no showing that the testimony of Mr. Panarese, who was called at the trial before this court to testify as to the existence of magnetometers, could not have been obtained for the suppression hearing before Judge Bramwell. Indeed, the opposite appears to be the case, since Mr. Panarese was "actively involved in the preparation of security for LaGuardia Airport" on the day of defendant's arrest (Tr. October 4, 1977 at 603), and would presumably have been just as available to the defense for the suppression hearing as he was for the trial before this court. The fact that the magnetometer evidence may have impeached the testimony of other witnesses is insufficient to require reconsideration of the motion to suppress, *cf. Mesarosh v. United States, supra,* and the court cannot say that Judge Bramwell's determination would have been different had this evidence been presented to him, *United States v. Soblen, supra.*[3] For the foregoing reasons, the court would deny the motion to reconsider the motion to suppress even if it were not bound by the Court of Appeals' prior affirmance of Judge Bramwell's decision.

With respect to defendant's guilt or innocence, the court makes the following findings of fact:

On April 26, 1972, defendant Paul Oates and Isaac Daniels boarded American Airlines flight 440 leaving Detroit at 7:20 p. m. bound for New York (119).[4] The tickets for both men had been purchased by defendant Oates, and had been paid for with his American Express card (Ex. 8, 9, Tr. 363–64, 373, 376, 388–90, 405–09, 411–13). Oates' ticket was a first class ticket (Ex. 9) and Daniels' ticket was a coach class ticket (Ex. 8, Tr. 389). Oates had also purchased return tickets for the two men on American Airlines flight 593 to Detroit leaving New York at 7:55 a. m. on April 27, 1972 (363–64, 388–90).

Prior to boarding the flight in Detroit, Oates and Daniels had been engaged in conversation (117). When they boarded the plane, Oates went to the first class section and Daniels went to the coach section (119). Daniels exhibited certain physical characteristics to indicate that he was addicted to drugs (120–121). There were no unusual bulges in his clothing (118).

The flight arrived in New York at approximately 10:00 p. m. After leaving the plane, Oates and Daniels rejoined one another (121). They began to walk down the corridor and were met by William McMillan, a one-time informant for the Government (161–62, 468–69) and an active participant in bringing buyers and sellers of illegal drugs together (469–70). The day before, April 25, 1972, Oates had telephoned McMillan from Detroit and asked McMillan to meet him at the airport on April 26. Oates also asked McMillan to put him in touch with a person known to them as "Twenty-One" (473).

Oates, Daniels and McMillan proceeded down the corridor to a telephone booth where McMillan placed a call to "Twenty-One." Oates joined McMillan in the telephone booth and spoke to "Twenty-One" while Daniels waited outside (122–23, 474–

---

3. Basically, defendant asks the court to hold that if he and Daniels had passed through a magnetometer and no weapon was detected, it was unreasonable for the agents to believe that Daniels was armed, and that there was, therefore, no reasonable justification for the frisk of Daniels which produced the heroin. Defendant's argument presupposes the infallibility of magnetometers, something which this court is unwilling to do. Indeed, the number of airplane hijackings in which the hijackers use weapons which they have managed to carry with them onto the airplanes after having passed through magnetometers is strong evidence that the magnetometers are not infallible. At any rate, the court will not establish a rule whereby trained law enforcement agents are prohibited from using their senses and experience to determine whether a person may be armed. To do so would be to pose potentially serious dangers to law enforcement personnel and to restrict them severely in the effective performance of their duties.

4. Numbers in parenthesis refer to the transcript of the trial before this court. Numbers preceded by "Ex." refer to exhibits.

75). The three men then entered McMillan's car and drove to "Twenty-One's" residence in Brooklyn. "Twenty-One" was not at home, so McMillan left a note and he, Oates and Daniels went to a night club where McMillan subsequently received a call from "Twenty-One." (475–76).

Oates, Daniels and McMillan drove to an apartment house in Manhattan where they met with "Twenty-One." Oates and "Twenty-One" went into a back room while Daniels and McMillan waited in the outer room. At some point, Daniels was called into the back room. McMillan could not see what transpired in that back room. Subsequently, McMillan drove Oates and Daniels to the Skyway Motel near LaGuardia Airport, dropping them off at about 3:00 or 4:00 in the morning of April 27, 1972. (477–80).

The first scheduled American Airlines flight back to Detroit subsequent to Oates' flight on April 26, 1972, was Flight 593 leaving LaGuardia at 7:55 a. m. on April 27, 1972. At approximately 7:00 that morning, Oates and Daniels were waiting in the departure lounge at the gate from which flight 593 was scheduled to depart. Although the seat next to Daniels was unoccupied, Oates and Daniels were not seated next to each other; rather, they were sitting some distance apart at right angles to each other so that Oates had a clear view of Daniels. They were not observed to speak to each other. Both Oates and Daniels were wearing the same clothes they had been wearing the night before and Daniels had a large bulge in his coat pocket and a large bulge on his right thigh (124–29).

A valid search, see *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977), uncovered a package taped to the inside of Daniels' right thigh; the package contained a white powder (134–36, 230). That powder was approximately 489 grams of heroin hydrochloride (431), 36.5%—36.8% pure, the heroin having been mixed with lactose (292–301, 417–25).[5] Oates and Daniels were arrested and advised of their constitutional rights (137, 203–05, 365–66). During processing by Customs agents, Oates stated that he did not know Daniels (368), a statement which was untrue.

Based on the foregoing facts, the court concludes that defendant Oates and Isaac Daniels agreed to come to New York to obtain heroin and that they did, in fact, obtain heroin from the person known as "Twenty-One." The court further concludes, based upon the large quantity of heroin involved here, that the heroin was for distribution. In addition, the court finds that Oates' false exculpatory statement made to Customs agents points to a consciousness of guilty. Accordingly, the court finds beyond a reasonable doubt that defendant Paul Oates knowingly, wilfully and intentionally entered into a conspiracy with Isaac Daniels and others to possess heroin with intent to distribute it. The court also finds beyond a reasonable doubt that on April 27, 1972, defendant Paul Oates was in constructive joint possession of the heroin seized from Daniels, that he did aid and abet Daniels to possess heroin, and that such possession was with intent to distribute. Defendant Paul Oates is therefore guilty as charged on both counts in the indictment.

5. The defendant spent a great deal of time on cross-examination attempting to establish breaks in the chain of custody of the substance seized from Daniels, and discrepancies in the amount of the substance remaining in the package following each analysis of the substance. Apparently, defendant's objective was to cast doubt as to whether the substance introduced at the trial was in fact the same substance seized from Daniels.

While the court believes that the substance offered at trial was the same substance seized from Daniels, it would make no difference even if it were not. Mr. Weinberg, who analyzed the powder that was taken from Daniels, testified that that powder was heroin. Subsequent breaks in the chain of custody would have no bearing on Mr. Weinberg's original analysis, and that analysis is sufficient to justify the conclusion that the package seized from Daniels was heroin. Moreover, the exact amount of heroin is irrelevant, since the conspiracy to possess heroin with intent to distribute and the possession of heroin with intent to distribute constitute crimes regardless of the amount of heroin involved.

Defendant shall appear before this court on February 21, 1978 at 10:00 in the morning for the purpose of setting a date for sentence. So ordered.