**UNITED STATES of America ex rel. Martin SOSTRE, Petitioner-Appellant,**

v.

**Frank M. FESTA, Superintendent of Erie County Jail, and Robert J. Henderson, Superintendent of Auburn Correctional Facility, Respondents-Appellees.**

**No. 283, Docket 74–1520.**

United States Court of Appeals, Second Circuit.

Argued Dec. 9, 1974.

Decided March 31, 1975.

Paul G. Chevigny, New York City (New York Civ. Liberties Union, New York City, Herman Schwartz, Edward Koren, SUNY, Amherst, N. Y., on the brief), for petitioner-appellant.

Arlene R. Silverman, Asst. Atty. Gen., New York City (Louis J. Lefkowitz, Atty. Gen., State of New York, Samuel

A. Hirshowitz, First Asst. Atty. Gen., of counsel), for respondents-appellees.

Before FEINBERG and MULLIGAN, Circuit Judges, and BRYAN,* District Judge.

MULLIGAN, Circuit Judge:

Petitioner appeals from the denial of a writ of habeas corpus by the Hon. John T. Curtin, whose opinion, which fully sets out the facts, is reported in 373 F.Supp. 133 (W.D.N.Y.1974). We affirm.

I.

a) The Trial

■■ Petitioner Sostre was convicted in a New York State court on March 18, 1968 of possession of a dangerous drug (heroin) and the sale of a dangerous drug, as well as second-degree assault. We are here concerned only with the sale count. Petitioner's conviction was predicated largely on the testimony of the state's principal witness, one Arto Williams, a heroin addict awaiting trial on a larceny charge at the time of the alleged sale. Williams, as an informer for the Buffalo, New York police, testified that he had purchased heroin from the petitioner on July 14, 1967. Williams now recants his earlier testimony, and it is this recantation which provides the foundation for petitioner's habeas application.[1]

In his March 1968 state court trial, the petitioner Sostre refused the services of

---

* United States District Judge for the Southern District of New York, sitting by designation.

1. After Williams's recantation, petitioner initially applied for a writ of error coram nobis in the same New York State court where he had been convicted. However, at that time Williams was in California and refused voluntarily to come to New York. The New York court was powerless to compel his attendance; as a result, the application for the coram nobis writ was denied on March 30, 1972, the State court noting that Williams's presence could not be compelled. No appeal from that denial was taken. Instead, and also on March 30, 1972, petitioner filed this application for a writ of habeas corpus.

Faced with the requirements of 28 U.S.C. § 2254(b), Judge Curtin assumed that the state remedy was ineffective since there was no method of compelling Williams's appearance in the New York proceeding. Moreover, the State stipulated that the federal habeas procedure was appropriate. We do not consider that the statutory requirement of exhaustion of state remedies can be waived by the State. Moreover, it is disquieting that the presumably contrite and recanting witness Williams was not willing to appear voluntarily in the State court proceeding. However, in view of the unique circumstances related herein and the assumption of jurisdiction below, it would be wasteful of judicial energy to dismiss now for exhaustion of State remedies. This is especially true since on this appeal counsel for petitioner indicated his lack of knowledge of Williams's present whereabouts.

counsel and refused to participate in the proceedings. Williams testified that, on the evening of July 14, 1967, he met with Detective Alvin Gristmacher of the Buffalo Police Department Narcotics Squad and State Trooper Lewis Steverson. After Williams was searched by Gristmacher, the three men drove to petitioner Sostre's "third world" bookstore in a black ghetto area of Buffalo. Thereupon Williams was given $14.00 by Gristmacher, and Williams and Steverson (a black who was in plain clothes) entered Sostre's store, where they encountered Sostre and one Geraldine Robinson.

Williams testified that he then asked Sostre whether the latter was "doing any business;"[2] Sostre responded that he did not want to transact any business in front of a stranger, i. e., Steverson, so the latter left the store but remained standing in front, slightly to the left of the open doorway where he could still observe the proceedings, and where Williams could still see him. From this vantage point Steverson saw Williams give money to Geraldine Robinson. Then, according to the trial testimony of both Williams and Steverson, Sostre went to the back of his store, returned to the front and handed Williams a white glassine envelope.

Williams thereupon left the store and, accompanied by Steverson, returned to the car, where Williams turned over the glassine envelope to Gristmacher. Upon later analysis, the envelope was found to contain heroin.

In addition, the activities of Williams, Steverson, and Sostre while in the bookstore were observed from a building across the street by two other troopers. One of the two, Trooper Wilcox, who was using a telephoto lens to make his observations, testified that he saw Williams hand what appeared to be money

to Geraldine Robinson, and that thereafter Sostre disappeared into the back of the store and returned to the front where he handed "something" to Williams.

The incidents just described occurred about midnight, and ten or fifteen minutes later, police officers executed a previously-obtained search warrant for Sostre's store. They arrested Sostre and recovered a marked $10 bill in his possession. They also searched the premises and found ten glassine envelopes containing heroin in the rear of the store.

As we have noted, at his trial Sostre refused to participate in any of the proceedings, since he claimed that the entire prosecution was a "frame-up" and that he had been singled out as a political radical, who, it was thought, had helped to instigate the June 1967 riot in Buffalo. Specifically, Sostre refused to cross-examine any of the witnesses who testified against him at the trial.

Following his conviction, Sostre was sentenced to a term of not less than 25 nor more than 30 years on the sale count, and lesser sentences on the other counts.[3]

After the trial, witness Williams left for California. There he became involved with an addict rehabilitation group called "Tuum Est." Allegedly because of the influence of that group, Williams decided to recant his trial testimony and, in April 1971, executed an affidavit in which he swore that Sostre had never sold him any drugs, and that Williams had lied at the trial in order to escape his own conviction as a second felony offender.[4] Subsequent to his Tuum Est experiences, however, Williams was again arrested, both in September and December of 1972, in California, for possession of heroin; as a re-

---

**2.** The trial testimony of Steverson on this point is that Williams asked Sostre if he could "cop a bag"—the generally understood term for the purchase of a bag of drugs.

**3.** Although the trial court ordered the sentences to run consecutively, this was changed by the Appellate Division to concurrent sen-

tences; the conviction was otherwise affirmed without opinion, 42 A.D.2d 1044, 348 N.Y.S.2d 760 (4th Dep't 1973). In January 1974, Sostre's application for leave to appeal to the New York Court of Appeals was denied.

**4.** In fact, Williams was only put on probation after conviction on the larceny charge.

sult, in January 1973, he pleaded guilty to a drug misdemeanor count. At the time of the hearing below he was in the custody of the California authorities.

Williams's recantation fathered the instant action, which in turn led to the hearing before Judge Curtin below on May 29–30, 1973.

b) The Hearing

The principal witness at this hearing was Arto Williams. He testified that, after his June 1967 arrest and pre-trial incarceration on a larceny charge, he took the initiative in contacting the Buffalo Police Narcotics Division by letter, offering his services. Subsequently Detective Gristmacher visited Williams in jail and asked the latter if he knew anyone who was selling drugs in the Buffalo area. Williams replied in the affirmative and recited a few names, none of which seemed, to Williams, to interest Gristmacher. Then Gristmacher asked Williams if Sostre was a drug dealer, and Williams replied in the affirmative. According to Williams, Gristmacher said that the police were "very interested" in Sostre because they believed him to be "the cause" of the 1967 riot. About a week later, when Gristmacher, this time accompanied by Chief Amico of the Narcotics Division, again visited Williams in his cell, the latter repeated that he knew Sostre was dealing in drugs.

Williams agreed to cooperate with the police. On July 14, 1967, Williams was released from prison on his own recognizance. He thereupon was brought to police headquarters where he met Gristmacher, who gave him some money and arranged to meet with him later that day. Williams then testified that he used the money to buy a quantity of heroin, part of which he used immediately, and part of which he retained in his possession. In addition, Williams "shot

up" some other drugs given to him by friends.

By the time he met Gristmacher at about 9 p. m. the same day, Williams was, by his own testimony, still very high. Gristmacher drove Williams to police headquarters; the former left the car and went inside the building for approximately 15 minutes, leaving Williams by himself in the car. At this time, Williams testified he secreted the small packet of unused drugs (measuring approximately $1\frac{7}{8} \times \frac{7}{8}$ inches) from his afternoon purchase under the front seat of the car, having already formulated the intent to use this portion of drugs to frame Sostre.

When Gristmacher returned to the car, he was accompanied by Trooper Steverson. Before driving off, Gristmacher frisked Williams but found nothing since (according to Williams) the drugs he had bought earlier were already hidden under the car seat.

The trio then drove around for awhile, ultimately arriving at a judge's home where a search warrant was obtained. During this trip, Williams testified that he was in the back seat of the car, with the two officers in front. On the way to Sostre's bookstore, Williams testified he was able to retrieve the packet of drugs hidden under the front seat without being detected by either of the two officers, and put it back in his pocket.[5]

Upon reaching the vicinity of Sostre's bookstore, Gristmacher gave $15 in marked bills to Williams, who left the car and entered the store with Steverson. After exchanging greetings with Sostre, Williams testified that he gave Sostre a "high sign" which indicated that he, Williams, wanted to see Sostre outside Steverson's presence. Accordingly, Sostre asked Steverson to leave, and he did so, remaining outside the store's front door.

---

**5.** The testimony of Steverson at the hearing is different; he testified that Williams was in the front seat at all times, next to Gristmacher and directly in front of Steverson who was in the rear seat. Steverson said that at no time did Williams bend over to reach under the front seat of the car, and that if Williams had done so, he (Steverson) would have noticed.

Williams then testified that he gave $15 to Sostre for safekeeping.[6] After the money had changed hands, Williams passed his hand over his shirt pocket, as if he were placing something therein. Sostre disappeared momentarily into the rear of the store; when he emerged, he and Williams engaged in some small talk, and then Williams left the store.[7] Williams and Steverson returned on foot to the car, where Williams handed over the drugs to Gristmacher, telling the police officer that he had bought them from Sostre, whereas in fact (according to Williams's recantation) he had obtained them earlier that day from someone other than Sostre.

A number of other witnesses testified at the hearing below, including petitioner Sostre himself, who admitted to six or seven prior convictions including a 12-year sentence ending in 1964 for the possession of heroin. Most significant was the testimony of State Trooper Steverson, who reiterated his trial testimony in full, in particular repeating that he saw Sostre hand a glassine envelope to Williams in Sostre's store.[8]

## II.

■■■ There is no dispute on this appeal that in a habeas corpus proceeding the three-pronged test to determine if a witness's recantation necessitates a new trial is whether

"a) The court is reasonably well satisfied that the testimony given by a material witness is false. ·

b) That without it the jury *might* have reached a different conclusion.

· c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial."

United States ex rel. Rice v. Vincent, 491 F.2d 1326, 1331–32 (2d Cir. 1974), quoting from Larrison v. United States, 24 F.2d 82, 87–88 (7th Cir. 1928). Judge Curtin here found that the first requirement was not complied with, i. e., he was not reasonably well satisfied that Williams's trial testimony was false. As the petitioner concedes, in order to succeed here on this habeas appeal he must establish that the conclusion of the court below with respect to the credibility of Williams's recantation was "clearly erroneous." See United States ex rel. Rosa v. Follette, 395 F.2d 721, 726 (2d Cir.), cert. denied, 393 U.S. 892, 89 S.Ct. 216, 21 L.Ed.2d 172 (1968). Judge Curtin indicated at the outset of the hearing below that the credibility of Williams is "really the whole issue here." Having in mind that Judge Curtin had the opportunity of personally observing the demeanor and the behavior of Williams on the stand under oath, which is a factor of major moment, see United States ex rel. Diblin v. Follette, 418 F.2d 408, 411 (2d Cir. 1969), we cannot by any means characterize his finding as "clearly erroneous."

Petitioner argues that Williams had a strong motive to testify falsely at the trial since he was facing a felony charge

---

**6.** On a previous occasion, apparently, Sostre had kept a suit of Williams's for a short time.

**7.** Williams's testimony on cross-examination at the hearing is slightly different: after the money changed hands, Sostre went into the back of the store. When he returned, Williams reached across the counter and then dropped his hand into his shirt pocket.

**8.** Petitioner's counsel attempts to impeach Steverson's testimony in two ways: 1) by pointing out that Steverson's affidavit of July 17, 1967 made no mention of seeing a glassine envelope pass from Sostre to Williams, but rather only stated that the two men extended their hands to one another. While this is a

significant omission, we believe it is outweighed by Steverson's sworn testimony, both at the trial and at the hearing below, that he did in fact see the drugs pass from Sostre to Williams; 2) by attempting to demonstrate that, from his vantage point, Steverson could not have seen the transaction. However, we believe the petitioner's evidence on this point is inconclusive at best, and certainly is not sufficient to impeach Steverson's testimony. While Steverson was not cross-examined at the trial due to Sostre's refusal to accept legal assistance or to participate in the proceedings himself, he was cross-examined at the hearing and Judge Curtin found that his testimony was "not shaken."

which, upon conviction, would subject him to a heavy sentence as a second felony offender. However, the very same fact could also account for Williams's willingness to testify *truthfully* at the trial to ingratiate himself with the police despite the fact that his purchase would result in the arrest of a fellow black who had at least on one occasion befriended Williams. In short, the motivation point does not advance the petitioner's argument here a jot or a tittle since it equally supports the proposition that Williams told the truth at the trial.

Petitioner further argues that Williams's willingness to testify at the hearing that his trial testimony was false would expose him to the real threat of a perjury charge.[9] However, the same can be said for every "recanter." And though there is always exposure to the threat of a perjury charge, traditionally the recantation of testimony given on trial is "looked upon with the utmost suspicion," United States v. Troche, 213 F.2d 401, 403 (2d Cir. 1954), quoting from Harrison v. United States, 7 F.2d 259, 262 (2d Cir. 1925); see 2 C. Wright, Federal Practice and Procedure § 557, at 526–28 (1969).[10]

Moreover, here there is other evidence which would indicate that Williams had a real fear for his own safety which might well outweigh his fear of a perjury conviction. On cross-examination at the hearing below Williams admitted that he left Buffalo for California after the trial because "I thought it wasn't safe for me being here [in Buffalo]." Williams's testimony on this point was clearly evasive and although he shied away from the admission of specific threats, he admitted that he was "worried." At the hearing there was also testimony from Peter Notaro, Chief of the Appeals Bureau of the Erie County District Attorney's office, who testified that after Sostre's conviction Williams had asked to be permitted to finish his probation or parole in California, since he feared that he would be injured "in some fashion" by Sostre's friends. He also stated that members of Williams's family had been threatened. The lower court also had before it Exhibit J, a letter from Williams to an official of the California State Department of Probation dated September 13, 1970, in which he stated that his brother was stabbed to death a month after Sostre's conviction, and that he (Williams) was used to set up a buy (from Sostre) which "came off as planned." He also stated, "I guess by now you know my life is in danger." Whether Williams's fear of retaliation was well-founded or whether there is any basis for his suspicion that his brother's life was taken because of his part in Sostre's conviction is not before us and is not relevant. The point is that, whether justified or not, Arto Williams was obviously a very frightened man at least as late as September, 1970.

As regards the contention that his motivation for recanting was his "conversion" by Tuum Est, we should point out that there was absolutely no evidence or testimony in the hearing before the court below to support the bona fides of Williams's decision to disavow his trial testimony. His two arrests in later 1972 for possession of heroin and his January 1973 guilty plea to a misdemeanor would suggest that he was no Paul of Tarsis. Even aside from the skepticism of Judge Curtin, who had the opportunity

---

9. In fact, Peter Notaro, the New York district attorney who tried Sostre's case in the State trial court, testified at the hearing that he intended to recommend that Williams be prosecuted for perjury.

10. Numerous cases from this circuit have refused to grant a new trial when the recantation of a witness was found by the trial court not to be credible. E. g., United States v. Curry, 358 F.2d 904, 918 (2d Cir. 1965), cert. denied, 385 U.S. 873, 87 S.Ct. 147, 17 L.Ed.2d

100 (1966) ("When as here the district judge resolves all doubt against the defendant and determines that the trial testimony is not impeached by the recantation, there is no need to try the case anew before a jury." (citation omitted)); United States v. Ratley, 284 F.2d 553, 554 (2d Cir. 1960); United States v. Persico, 339 F.Supp. 1077 (E.D.N.Y.), aff'd on the opinion below, 467 F.2d 485 (2d Cir. 1972), cert. denied, 410 U.S. 946, 93 S.Ct. 1360, 35 L.Ed.2d 613 (1973).

at first hand to observe the demeanor and behavior of Williams on the stand and thus to gauge his veracity, the "recantation" itself as it appears on the record to this appellate court is inherently incredible and at best Procrustean. During the entire transaction Williams was either in the company or under the observation of the police. The story he now tells neatly and substantially fits in with his prior trial testimony except for the crucial question as to whether or not the drug envelope he surrendered to the police was provided by Sostre or by his own sleight of hand. There is no contention here or below that the police participated in or were even aware of the fact that Williams intended to frame Sostre by palming off his own drugs. In fact, they were careful to frisk him before driving off in the police car to insure that he was free of drugs. Williams would now have us believe that although he was admittedly high on drugs, he had the prescience to secrete the drug envelope under the front seat of a police car in order to thwart its detection on his person. Yet upon questioning by the court Williams admitted that he did not know the details of the plan or when the arrest of Sostre was to take place (though he did know that Sostre was the target of the bust). It strains credulity to believe that Williams could anticipate the timing and place of the frisk or that he could retrieve the drugs in time to frame Sostre.

Moreover, as we have already noted, Williams's story that he was alone in the back seat of the car and was able to pick up the drugs without being detected, was contradicted by Steverson who placed him in the front seat next to Gristmacher. It is beyond belief that Williams could retrieve the small packet under the front seat of the car without drawing the attention of two experienced police officers who were with him in such close proximity. The further claim that Williams passed the money to Sostre for safekeeping and not for the purchase of drugs is inconsistent with the fact that, within 10 or 15 minutes of the transaction in question, some 10 glassine bags of heroin were found by the police in the back of Sostre's store, the very place where, according to some testimony (see note 7 supra and accompanying text), Sostre had gone immediately before handing over the drugs to Williams.

In view of the foregoing testimony and evidence produced at the hearing, and emphasizing the opportunity of the experienced jurist personally to estimate the credibility of the witnesses who appeared before him, we cannot characterize as "clearly erroneous" the finding of Judge Curtin that he was not reasonably well satisfied that the testimony of Arto Williams at the petitioner's trial was false.

Accordingly, we affirm.

FEINBERG, Circuit Judge (concurring):

Although I concur in the result reached by the majority in this troubling case, I think it appropriate to record some further observations.

I am concerned first of all with the attitude the state has displayed in this proceeding toward the requirement that an applicant for federal habeas corpus exhaust his remedies in the state courts. That statutory requirement is not merely a formal admonition. It goes to the heart of the federal-state distribution of power and affords a state court system the chance to keep its own house in order before a federal court steps in to rule on a federal constitutional claim. In this court, after a request from the panel for further briefing on the exhaustion question,[1] the state now suggests

---

1. In post-argument letters, the parties dispute the applicability of N.Y.Crim.Proc.Law § 650.-20 (McKinney 1971) (securing attendance as witness of prisoner confined in another jurisdiction), N.Y.Crim.Proc.Law § 680.10 (examination of witness on commission), and N.Y. Crim.Proc.Law § 640.10(3) (Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings). The key question, apparently decided against Sostre by the state coram nobis court and not appealed, is whether these procedures are available in a post-conviction proceeding.

that means were available to secure Arto Williams's testimony for the coram nobis proceeding in the state court. Yet, before Judge Curtin, the state in effect stipulated that state remedies had been exhausted, as Judge Mulligan's thorough opinion points out in footnote 1. More significantly, in the coram nobis proceeding, the District Attorney apparently argued that various suggested methods to obtain the testimony of Williams were unavailable. The effect of the state's change in position, if accepted, would thus be first to deny a state remedy and then to frustrate federal relief.

This manipulation of the exhaustion doctrine is particularly disturbing because this is precisely the kind of case that has provoked frequent admonitions from state prosecutors to the federal courts not to be quick to "interfere" with the state criminal process. Justifiably or not, Sostre has become to some a symbol of the inequities of our criminal justice system.[2] The record shows that in 1967 the Buffalo police were out to "get" Sostre because they thought he was the principal instigator of the then recent riot in the black ghetto of the city. Moreover, his original sentence was a savage one: 25 to 30 years on the conviction now under attack for the sale of one packet of heroin, five to ten years for his fracas with the arresting officers, one year for possession of the heroin packets, and 30 days for contempt of court, all to be served *consecutively*. This was virtually a life sentence for a man then in his mid-forties.[3] Furthermore, Sostre has remained a marked man in prison. From prior proceedings before us, we know that he was kept in solitary confinement under outrageous conditions for over a year and was then harshly punished again for having "dust" on his cell bars.[4]

In a case stirring such strong feelings, a claim that the conviction was based on perjurious testimony goes to the very heart of the criminal process, which, to be effective, must ultimately rest upon the confidence of the citizenry that it is fair and thorough. How appropriate, then, that a searching inquiry into a possibly tainted conviction should have been made, in the first instance, through the state judicial process, since its integrity was being challenged. Arto Williams was located in May 1973 in custody in California. One wonders why it was impossible then for New York State officials to arrange with California officials to have Williams transported to New York for a reopened hearing on the coram nobis petition.

Nevertheless, I agree with the majority that it would be an unfortunate exercise in futility to dismiss now for failure to exhaust. There was substantial doubt about the technical availability of compulsory state process to secure Williams's testimony and, as the majority points out, counsel for Sostre now indicates "his lack of knowledge of Williams's present whereabouts." Under the circumstances, sound judicial administration suggests upholding Judge Curtin's assumption of jurisdiction.

I am concerned also in this case because the record is unfortunately incomplete in a number of respects which bear on whether Williams told the truth in 1973 when he exonerated Sostre or in 1968 when he implicated him. For ex-

---

2. See, e. g., V. Copeland, The Crime of Martin Sostre (1970); Schwartz, A Comment on Sostre v. McGinnis, 21 Buff.L.Rev. 775, 775–76 (1972). In addition to the landmark case of Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971) (en banc), cert. denied, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), Sostre has been a plaintiff in a number of other actions seeking to establish the rights of prisoners: Sostre v. Otis, 330 F.Supp. 941 (S.D.N.Y.1971) (Mansfield, *J.*); Sostre v. McGinnis, 334 F.2d 906 (2d Cir.), cert. denied, 379 U.S. 892, 85 S.Ct. 168, 13 L.Ed.2d 96 (1964); Pierce v. La Vallee, 293 F.2d 233 (2d Cir. 1961), on remand, 212 F.Supp. 865 (N.D.N.Y.1962), aff'd, 319 F.2d 844 (2d Cir.), cert. denied, 374 U.S. 850, 83 S.Ct. 1913, 10 L.Ed.2d 1070 (1963).

3. The Supreme Court, Appellate Division, Fourth Department, modified the sentences so that they run concurrently. 42 A.D.2d 1044, 348 N.Y.S.2d 760 (1973).

4. Sostre v. McGinnis, supra, 442 F.2d at 187 n. 8.

ample, one of the key documents before Judge Curtin was an affidavit of Williams, dated April 8, 1971, in which he swears that he framed Sostre. That document states that before Williams decided to tell "the truth" he had long discussions with Hollis Candy Latson, the coordinator of Tuum Est, and that Latson wrote to Judge Motley of the United States District Court for the Southern District of New York on March 26, 1971, telling her of Williams's decision to recant. Was there such a letter from Latson? Who was Latson? Was he a person who might be particularly believable because of his background? What did Williams say to him prior to his recantation? Was Latson available as a witness? Another witness uncalled at the habeas hearing before Judge Curtin was Detective Gristmacher, who was clearly the prime mover in enlisting Williams as an informer, and who continued to look out for Williams and even used him to make another buy. Apparently, the state did not call Gristmacher because, according to Sostre's own affidavit in support of the petition, Gristmacher "was fired from the police force on March 15, 1972 for appropriating 5 ounces of heroin from the evidence locker of Police Headquarters, and refusing to cooperate with the Federal authorities in regards to the stolen heroin." If this allegation is accurate, Sostre's claim that this occurrence impeaches Gristmacher's credibility would appear to be an understatement.

The case thus presents serious procedural and factual questions. But while these matters are not free from doubt, the issue before the federal district court was whether Sostre had been denied due process because of the alleged perjury of Williams. The burden of proof in this post-conviction proceeding was on Sostre. Appellant has had his day in court on his constitutional claim before an experienced and fair federal trial judge. The crucial fact is that Judge Curtin heard Williams testify and simply did not believe his story. After long and careful review of the record, I cannot say that Judge Curtin's decision was clearly erroneous. Accordingly, I concur in the affirmance of the order of the district court.