UNITED STATES of America,

v.

Kenneth VALENTINE, Defendant.

No. S 86 Cr. 375 (RWS).

United States District Court,
S.D. New York.

Feb. 5, 1987.

See also, D.C., 644 F.Supp. 818.

Rudolph W. Giuliani, U.S. Atty., S.D.
N.Y., New York City, for U.S.; Thomas E.
Moseley, Asst. U.S. Atty., of counsel.

Thomas Fitzpatrick, New York City, for
defendant.

OPINION

SWEET, District Judge.

Defendant Kenneth Valentine ("Valentine") has moved for an order pursuant to
Fed.R.Crim.P. 33, setting aside the jury

verdict in this case and ordering a new trial or, in the alternative, granting a factual hearing on the basis of newly discovered evidence of prosecutorial misconduct. The motion is hereby denied.[1]

In post-trial motions, Valentine requested a new trial in the interests of justice because of an alleged pattern of prosecutorial misconduct, including the use of false testimony and a deliberate misrepresentation in summation. Valentine claimed that the prosecutor manipulated the testimony of Robert Grubin ("Grubin") to give the jury the false impression that Grubin had received a loan and then, in summation, falsely claimed that Grubin, like the other brokers who testified at trial, had received a loan. The motion for a new trial was denied by this court's opinion of September 23, 1986.

Valentine now asserts that he has "newly discovered evidence" of unfair conduct by the prosecutor. Fed.R.Crim.P. 33. This evidence consists of events from another prosecution, *United States v. Flannery*, 86 Cr. 374 (Duffy, J.), which did not involve the issues addressed in the present trial: whether Valentine received a $1,000 loan from Jamie Spangler ("Spangler") in order to contribute to the Bell Campaign, and whether he falsely denied receiving such a loan in his testimony before the grand jury. Its only relation to this case is that it involved charges of perjury and obstruction of justice in connection with the Falls Church, Virginia branch of First Jersey Securities, Inc., by whose Rochester branch Valentine was employed. Although *Flannery* was tried by the same prosecutor, it did not involve loans made to brokers, nor did Grubin testify at trial in this connection.

In *Flannery*, the Honorable Kevin T. Duffy ordered a new trial after a hearing on allegedly improper conduct by the same prosecutor who is before the court in this case. Defense counsel claimed that the prosecutor (1) failed to disclose to the defense an S.E.C. cooperation agreement with a Government witness, (2) distorted the testimony of Richard Saunders ("Saunders") by failing to elicit from Saunders the context of a statement which he overheard Flannery make, and (3) stated in summation that Saunders was a "totally disinterested witness," despite the fact that Saunders had told the Government that he did not like Flannery and suspected him of stealing his customer book. In the hearing on the *Flannery* claims, the court questioned the same prosecutor about an incident in a third case, *United States v. Guntle*, 86 Cr. 377 (Pollack, J.), in which the prosecutor made allegedly unfounded objections to questions to Saunders about the overheard conversation.

 This "newly discovered evidence" of prosecutorial misconduct in the Valentine trial is insufficient to warrant re-examination of the issues already raised in post-trial motions. The prosecutor's alleged misconduct in other trials—"a misleading direct, improper objections on cross to prevent exposure of the distortion, and false representations in his summation"—while not irrelevant to a determination of the prosecutor's conduct in this unrelated case, is not sufficiently probative of the prosecutor's conduct here to constitute newly discovered evidence of misconduct in this case. This is not a case, as *Flannery* was, where the witness whose testimony is at issue later stated that he told the prosecutor that his testimony as elicited by the prosecutor was misleading. *Cf. United States ex rel. Sostre v. Festa*, 513 F.2d 1313, 1317 (2d Cir.) (witness' recantation necessitates a new trial when certain conditions are met), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975). Nor does the evidence constitute newly discovered impeachment material which, in any event, is ordinarily not sufficient to justify a new trial. *See Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); *United States v. Myers*, 534 F.Supp. 753, 756 (E.D.N.Y.1982). The discovery of evidence

---

**1.** Both parties agree that this court has the jurisdiction to consider this motion, despite the fact that Valentine has taken an appeal to the Second Circuit, which appeal was argued on January 21, 1987. *See Ryan v. United States Lines Co.*, 303 F.2d 430, 433–34 (2d Cir.1962); *United States v. Minkoff*, 181 F.2d 538 (2d Cir.1950).

that might be relevant to a claim of prosecutorial misconduct already made but which is not material to such a claim does not rise to the level of newly discovered evidence. *Cf. United States v. Myers, supra,* 534 F.Supp. at 756. ("To require a new trial the newly discovered evidence must be material, not merely cumulative...."). Furthermore, this evidence was not in existence at the time of Valentine's trial and thus cannot constitute evidence upon which a new trial could be based. *See United States v. Bolden,* 355 F.2d 453, 461 (7th Cir.1965), *cert. denied,* 384 U.S. 1012, 86 S.Ct. 1919, 16 L.Ed.2d 1018 (1966); *see also Ryan v. United States Lines Co.,* 303 F.2d 430, 434 (2d Cir.1962) (holding that the analogous civil rule, Fed.R.Civ.P. 60(b)(2), permits reopening a judgment "only on the discovery of evidence in existence and hidden at the time of judgment").

■ Alternatively, even accepting the *Flannery* and *Guntle* proceedings as newly discovered evidence, Valentine has failed to meet the standard for granting a new trial. In most cases, a defendant seeking a new trial on the basis of newly discovered evidence must meet the exacting standard that the new evidence is material, not merely cumulative or impeaching, *see United States v. Oates,* 445 F.Supp. 351, 353 (E.D.N.Y.), *aff'd,* 591 F.2d 1332 (2d Cir.1978), and is such that its introduction "would probably produce an acquittal." *United States v. Gilbert,* 668 F.2d 94 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982). In some situations, however, a less restrictive standard has been held to apply. When the prosecutor has knowingly allowed false testimony to go uncorrected, or has failed to disclose exculpatory material, the Second Circuit has held that the standard to be applied is whether "there was any reasonable likelihood that it affected the fairness of the defendant's trial." *Perkins v. LeFevre,* 642 F.2d 37, 40 (2d Cir.1981) (citing *Napue v. Illinois,* 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959)). *Compare United States v. DeSapio,* 435 F.2d 272, 287 (2d Cir.1970) (noting that in instances of prosecutorial misconduct, this Circuit applies "the less severe test of probable effect"), *cert. denied,* 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971).

The present claims fall within neither of these two classes of cases. Although Valentine claims that the prosecutor elicited misleading testimony from Grubin on direct, Grubin's testimony was clarified on both direct and cross examination. Valentine alleges that when Grubin testified that Spangler had proposed writing Grubin a check, after which Grubin "would write him [meaning Bell] a check in return," the Government deceived the jury into believing that "him" referred to Spangler. The testimony was as follows:

Q. What did he [Spangler] say to you and what did you say to him?

A. At the time he said that Bob Brennan, who was the president of First Jersey was running the campaign for Jeffrey Bell for Senate or running the financial aspect of the campaign, and had been requested by Mr. Brennan to get some financial support from the employees.

Mr. Spangler at that moment had asked if I wanted to, wanted to contribute and he had come up with the sum, he said the sum would be a thousand, a thousand dollars, at which point, you know I guess I thought about it and then, you know I eventually did agree to it.

Q. Did he ever discuss with you the subject of giving you the money to contribute?

A. That was brought up at the time. He had asked if I had the money to give and suggested that he would give the money to me and then I would write him a check in return.

Q. And did he write you out a check?

A. He did.

Q. I would like to hand you what has previously been marked as Government Exhibit 16 for identification, Mr. Grubin. Just take a look at that.

(Handing to the witness)

(Pause)

Is that Mr. Spangler's check to you for $1,000?

A. This is the check.

Q. And does that have your endorsement on the back?

A. That's my signature.

MR. MOSELEY: I would like to have Government Exhibit 16 received in evidence.

MR. FITZPATRICK: No objection.

THE COURT: Exhibit 16 is admitted.

(Government Exhibit 16 marked for identification was received in evidence)

Q. Is there a number on that check, Mr. Grubin?

A. 1528.

Q. And the amount of that check is for a thousand dollars?

A. That is correct.

Q. By the way, in May of 1982, did you have registration, political party registration?

MR. FITZPATRICK: Objection, Your Honor.

THE COURT: Sustained.

Q. I would like to hand you what has previously been marked for identification as Government Exhibit 16A.

(Handing to the witness)

(Pause)

Is that your—Government Exhibit 16A, just tell us what that is?

A. That is my check to the Bell for Senate for $1,000.

MR. MOSELEY: I would like to have that received in evidence, Your Honor.

MR. FITZPATRICK: No objection.

THE COURT: It is admitted.

(Government Exhibit 16A marked for identification was received in evidence).

(Tr. at 109–112).

While at this point Grubin's testimony seemed to be that he had received a loan from Spangler, the Government asked Grubin directly if he had received a loan:

Q. Mr. Grubin, did you ever pay Jamie Spangler back the thousand dollars?

A. I can't recall that I ever did. I attempted to look back through my records to find a check back to him and I haven't as of yet found one.

(Tr. at 113). In cross examination, defense counsel, who had had an opportunity to interview Grubin prior to trial, questioned Grubin extensively on his recollection of the conversation with Spangler, (Tr. at 114–123), and elicited from Grubin that by the statement that Grubin "would write him a check in return," he meant that he would write Bell, rather than Spangler, a check. (Tr. at 118).

■ Therefore, any misleading impression given by Grubin by stating that he "would write him a check in return" was subsequently corrected. There is no evidence that any false testimony was given by Grubin at trial. There is also no evidence that the Government intended to deceive the jury on this issue, given the direct question asked of Grubin later by the Government. *See United States v. DeSapio*, 435 F.2d 272 (2d Cir.1970), *cert. denied*, 402 U.S. 999, 91 S.Ct. 2170, 29 L.Ed.2d 166 (1971). Thus, the claim of "false testimony" is unfounded and does not call for a more restrictive standard of review. Since Grubin's testimony was that he could not recall having received a loan, a statement that is not alleged to be false, no prejudice to Valentine could have resulted.

■ The claim that the Government made a deliberate misrepresentation in summation also does not fall within either of the classes of cases in which courts have applied a stricter standard. Misrepresentations in summation require the defendant to show "substantial prejudice" on even an original post-trial motion. *United States v. Modica*, 663 F.2d 1173, 1178–82 (2d Cir. 1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *see United States v. Burse*, 531 F.2d 1151, 1154 (2d Cir.1976) (agreeing with court below that prosecution's closing statement was "sufficiently prejudicial to require reversal"); *cf. Berger v. United States*, 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935) (where misconduct of prosecutor is "pronounced and persistent," prejudice is "so highly probable that we are not justified in assuming its non-existence").

In summation, the Government argued that there had been a plan to loan brokers money for the contribution:

It's May, ladies and gentlemen, it's May 1982 the primary election you heard from Mrs. Gabriele is June 8, 1982. We are down to the last few weeks of the campaign. And ladies and gentlemen, what do finance chairmen of campaigns want in the last few weeks? They want finances, they want contributions. And it fell on Jamie Spangler, the First Jersey branch manager up in Rochester, to get contributions and to get them from the people who worked for him.

You remember Mr. Fitzpatrick in his opening talked about Jamie Spangler putting the arm on his people, and that's just what happened here, he had his salesmen in one by one by one.

And, ladies and gentlemen, what does he do? He asks these salesmen in and asks them to make a contribution. And what does he do? You heard that testimony, ladies and gentlemen. *He gives them each a thousand dollars, a thousand dollars loan so that they can contribute to this candidate in New Jersey they had never heard of.*

. . . . .

First Jersey Securities is a securities firm. But what is happening here? Spangler isn't calling his salesmen in one by one by one to talk about the market to say, "Did it go up, did it go down," he's asking them to contribute to a campaign, to an out of state campaign and he is asking them to contribute $1,000 apiece. That's the most that they can do. *And he is loaning them the money ladies and gentlemen,* he is loaning them the money to this $1,000 contribution.

. . . . .

And, of course, ladies and gentlemen, as you will see in Government Exhibit 5B, the campaign records, each one of these individuals one right after the other gave contributions to the Bell for Senate Campaign. And you heard their testimony, the testimony of the brokers, Brian Thomas, Jim Villa, John McAuliffe, James Battaglia and Robert Grubin, and you heard their testimony, ladies and gentlemen, about what happened.

Now, did Ken Valentine get a loan, ladies and gentlemen? Did Ken Valentine get a loan?

Of course he got a loan, ladies and gentlemen. Here's the check, Government Exhibit 6. This is the kind of evidence that doesn't lie, ladies and gentlemen. This is the check to Ken Valentine for $1,000. (emphasis added)

■ Even if the Government meant to imply by the underlined language that all five brokers had testified to receiving loans from Spangler, such a statement under these circumstances meets neither the "prejudicial" standard under the *Modica* line of cases nor the *Perkins v. LeFevre* standard of reasonable likelihood of affecting the fairness of the trial. The jury was presented with the testimony of the four other brokers that they had received loans from Spangler to make the contributions, as well as Spangler's check to Valentine and Valentine's check to the Bell Campaign. In addition, the jury had before it the checks from Spangler to the four brokers, which fell in numerical sequence directly after the check to Valentine. Thus, even an express statement in summation that four of the five brokers expressly recalled having received a loan could not have affected the judgment of the jury that Valentine received a loan. Furthermore, the jury heard Grubin state several times that he did not recall having received a loan. *See United States v. Della Universita,* 298 F.2d 365, 367 (2d Cir.), *cert. denied,* 370 U.S. 950, 82 S.Ct. 1598, 8 L.Ed.2d 816 (1962).

Therefore, the motion for a new trial is denied. Because there is no basis for granting a factual hearing, that request is also denied.

IT IS SO ORDERED.