**UNITED STATES of America, Appellee,**

v.

**Kenneth VALENTINE,
Defendant-Appellant.**

**No. 723, Docket 86–1422.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 21, 1987.

Decided June 5, 1987.

Thomas Fitzpatrick, New York City (Craig J. Albert, Hertzog, Calamari & Gleason, New York City, of counsel), for defendant-appellant.

Thomas E. Moseley, New York City, Asst. U.S. Atty. for S.D.N.Y. (Rudolph Guiliani, U.S. Atty. for S.D.N.Y., of counsel), for appellee.

Before KAUFMAN, KEARSE, and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge.

Kenneth Valentine appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York, Robert W. Sweet, *Judge*, for making a false material declaration under oath before a grand jury in violation of 18 U.S.C. § 1623, and from two orders denying post-trial motions for judgment of acquittal or, in the alternative, for a new trial. The principal issue on appeal is prosecutorial misconduct, specifically, whether the prosecutor presented his case in such an unfounded manner as to cause Valentine substantial prejudice and deprive him of a fair trial. Because our *in camera* review of the grand jury testimony of persons the government chose not to call as trial witnesses indicates that the prosecutor misrepresented, at least implicitly, the substance of the testimony of several grand jury witnesses, we reverse the judgment of conviction and remand for a new trial.

## BACKGROUND

This case was a by-product of the government's grand jury investigation into possible violations of federal law arising from political contributions made by brokers employed by First Jersey Securities, Inc. ("First Jersey"), to Jeffrey Bell's 1982 campaign for the republican party nomination for United States senator from New Jersey. Because fifteen $1000 checks drawn on the account of Jamie Spangler, then manager of First Jersey's Rochester and Buffalo branch offices, were made payable to contributing brokers, including Valentine, the government suspected that the contributions were actually paid for with company funds as part of a conspiracy to defraud the United States.

At his first grand jury appearance on January 16, 1986, Valentine, then no longer employed by First Jersey, produced the check he wrote to the Bell campaign and his 1982 federal tax return, but denied that First Jersey had reimbursed him for his contribution. Valentine also testified that soon after making the contribution he received a form letter from Robert Brennan, then president of First Jersey and Bell's finance chairman, thanking Valentine for making the contribution and asking him to sign an acknowledgment appearing at the bottom of the letter. Valentine signed the acknowledgment, which stated that he had made the contribution voluntarily and from personal funds, and he testified to its veracity before the grand jury.

On April 17, 1986, Valentine again appeared before the grand jury and testified that his political contribution came from

personal funds, that he had not been reimbursed for his contribution, and that he had received neither a gift nor a loan from Spangler with which to make the $1000 contribution.

Soon thereafter Valentine was charged with perjury in a two-count indictment. Count one, relating to Valentine's April 17 grand jury testimony, charged that he had made a false material declaration in stating that his campaign contribution was made from personal funds and in denying that Spangler had given him the $1000 with which to make the contribution. Count two, relating to his January 16 grand jury appearance, charged Valentine with perjury for denying the falsity of the acknowledgment he had signed on Brennan's form letter.

A superseding indictment was filed on June 11, 1986. Count one of that indictment, again relating to Valentine's April 17 appearance before the grand jury, set forth three specifications: specification one referred to the personal funds acknowledgment; specification two referred to Valentine's denial of having received a gift from Spangler (the "gift theory"); and specification three referred to his denial of having received a loan from Spangler (the "loan theory"). Count two was unchanged.

At the two-day trial, the government apparently chose a strategy of pursuing a conviction under the loan theory to the exclusion of the gift theory. The government introduced into evidence fifteen nearly sequentially numbered $1000 checks drawn on Spangler's personal account and made payable to brokers employed by First Jersey, and a chart listing the number, payee, date, and amount of each check. Moreover, the government called five of the fifteen check recipients as trial witnesses and elicited testimony describing how Spangler had called the brokers into his office one by one to solicit contributions for the Bell campaign. Supported by this evidence, the government contended there was a consistent pattern of loans made by Spangler to finance the contributions, and argued that because the five brokers who had been called as trial witnesses could

recall the circumstances surrounding their loans from Spangler, Valentine, in testifying before the grand jury, also must have remembered receiving a $1000 loan from Spangler.

Valentine objected strenuously to the admission into evidence of nine of the checks because they were made payable to brokers whom the government would not call to testify at trial. Valentine argued that the government should not be permitted to imply that those nine checks also represented loans from Spangler without calling the payees as trial witnesses, particularly when the government might well know, through the brokers' grand jury testimony, precisely how they would characterize Spangler's payment. The basis of Valentine's argument was that those transcripts might constitute material, exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and might therefore show that the government had no good faith basis to opt exclusively for the consistent-pattern-of-loans theory of culpability.

Although Judge Sweet admitted all the checks into evidence after weighing their probative value against the danger of unfair prejudice under Fed.R.Evid. 403, Valentine did succeed in persuading Judge Sweet to order, in light of the government's trial strategy, that transcripts of the grand jury testimony of brokers who had not been called as trial witnesses be filed under seal with the district court. For some reason those transcripts were not actually filed below; however, after a request by this panel during oral argument, the government has filed them with this court and we have reviewed them.

The only evidence admitted at trial that related directly to Valentine was his grand jury testimony, Spangler's check to him, his check to the Bell campaign, the form letter from Brennan containing Valentine's signed acknowledgment, and a Bell campaign record showing receipt of Valentine's contribution.

At the close of the government's case, Valentine moved to dismiss both the loan and gift theory specifications, arguing that

they were inherently inconsistent and that the government had presented contradictory evidence. In response to this motion, the government attempted to reconcile the two specifications by arguing that the term "give" as used in the grand jury testimony and the superseding indictment meant "convey" or "transfer" as opposed to "gift". Rejecting this argument as being contrary to the context in which the term was used in the grand jury, Judge Sweet ruled there was insufficient evidence to support the gift theory specification and refused to submit that specification to the jury. The defense rested without calling any witnesses or offering any evidence.

Thus, the case went to the jury solely on the loan theory. During the trial, however, the testimony of the five brokers called as witnesses was not wholly consistent with regard to how the $1000 checks made by Spangler should be characterized: three brokers testified to having received a loan, which they had repaid; one testified to having received a loan that he had yet to repay, although he had testified before the grand jury that the payment was not actually a loan; and the fifth broker, Robert Grubin, testified to having received a $1000 gift from Spangler.

Despite this slightly discordant testimony, the government strictly adhered to its loan theory of culpability, as demonstrated in its summation:

> Ladies and gentlemen, you also heard testimony, Mr. Spangler had a plan, and you heard about that plan, ladies and gentlemen, from the brokers who testified. Spangler's boss, Bob Brennan, the head of First Jersey Securities, was finance chairman for the Jeffrey Bell for Senate Campaign.
>
> It's May, ladies and gentlemen, it's May 1982, the primary election * * * is June 8. We are down to the last few weeks of the campaign. And, ladies and gentlemen, what do finance chairman (sic) of campaigns want when it is the last few weeks? They want finances, they want contributions. And it fell on Jaimie (sic) Spangler * * * to get contributions and to get them from the people who worked for him.
>
> *    *    *    *    *    *
>
> And, ladies and gentlemen, what does he do? *He asks these salesmen in and asks them to make a contribution.* And what does he do? You heard that testimony, ladies and gentlemen. *He gives them each* a thousand dollars, *a thousand dollars loan so that they can contribute to this candidate* in New Jersey they had never heard of.
>
> *    *    *    *    *    *
>
> [H]e's asking them to contribute to a campaign, to an out of state campaign and he is asking them to contribute $1,000 a piece (sic). That's the most that they can do. *And he is loaning them the money,* ladies and gentlemen, *he is loaning them the money to make this $1,000 contribution.*
>
> *    *    *    *    *    *
>
> Ladies and gentlemen, those are the facts. They speak for themselves. Apply your common sense in this regard. *This is something that stands out. This is something you don't forget.*
>
> Now, ladies and gentlemen, just *look for a moment at the chart,* Government Exhibit 37 in evidence. *Look at the sequence,* ladies and gentlemen. *Look at the checks one right after the other after the other, after the other.*
>
> *    *    *    *    *    *
>
> And, of course, ladies and gentlemen, as you will see in * * * the campaign records, *each one of these individuals one right after the other right after the other gave contributions* to the Bell for Senate Campaign * * *.
>
> Now, did Ken Valentine get a loan, ladies and gentlemen? *Did Ken Valentine get a loan?*
>
> *Of course he got a loan,* ladies and gentlemen. *Here's the check,* Government Exhibit 6. *This is the kind of evidence that doesn't lie,* ladies and gentlemen. *This is the check to Ken Valentine for $1,000.*
>
> *    *    *    *    *    *

*Do you think for a moment,* seriously think for a moment, ladies and gentlemen, that Ken Valentine, up in Rochester, New York, who has never made a political contribution in his life, Ken Valentine, who has never heard of Jeffrey Bell, does anyone seriously think *that Ken Valentine is going to contribute $1,000 without getting a loan from his branch manager, the branch manager who asked him to contribute in the first place?* Is he really going to give a quarter of his monthly salary to a candidate he doesn't know of without getting a loan, ladies and gentlemen?

Apply your common sense to that. (Emphasis added).

After two days of deliberations, the jury acquitted Valentine of the perjury charges relating to the personal nature of the funds he had used to make the contribution, but found him guilty of perjury under the loan theory specification. After the verdict, Valentine moved for a judgment of acquittal under Fed.R.Crim.P. 29 and, alternatively, for a new trial under rule 33. In support of these motions, defense counsel argued, among other things, that the government had acted improperly to the point of depriving Valentine of a fair trial in presenting its consistent-pattern-of-loans theory to the jury after only three of the five broker witnesses had testified unequivocally to having received loans which they had actually repaid and after defense counsel in seeking disclosure of grand jury testimony had stated to the district court that, based on his pre-trial investigation, he believed at least two of the nine brokers not called as trial witnesses had testified before the grand jury to not having received a loan from Spangler.

Judge Sweet rejected this argument and denied Valentine's motion, finding that dismissal of the gift theory specification caused Valentine no prejudice and that there was no fatal inconsistency between the gift theory and the loan theory specifications. *United States v. Valentine,* 644 F.Supp. 818 (S.D.N.Y.1986). Valentine moved the district court to reconsider its decision on the ground that the court failed to consider his claim of prosecutorial misconduct. Judge Sweet granted the motion but upon reconsideration, denied Valentine's underlying motion because he could not conclude that a new trial would produce a different result. *U.S. v. Valentine,* 655 F.Supp. 731 (S.D.N.Y. 1987). This appeal followed.

## DISCUSSION

Among the arguments pressed on appeal, Valentine contends that the manner in which the prosecutor conducted the trial below deprived him of his right to a fair trial. We are persuaded, especially after reviewing the grand jury testimony of the brokers not called as trial witnesses, that the assistant United States attorney below misrepresented that testimony, as well as Grubin's trial testimony, as conforming to his consistent-pattern-of-loans theory. The improper manner in which the prosecutor presented his case caused substantial prejudice to Valentine, severely undermines our confidence in the jury's verdict, and warrants reversal of the judgment of conviction and a new trial.

Although there were nine brokers, excluding Valentine, who received $1000 checks from Spangler but were not called as trial witnesses by the government, apparently only four of them testified before the grand jury. Our *in camera* review of their grand jury testimony reveals why the government chose not to call them as witnesses: their testimony would not have supported the government's loan theory of culpability. Following is a summary of the relevant portions of that testimony:

*Scott Stowell:* denied receiving either a gift, a loan, or any reimbursement; did not recall Spangler offering him a loan; and denied that Spangler wrote him a check to enable him to make the $1000 political contribution.

*Richard Lefauve:* repeatedly denied ever receiving reimbursement or promises of reimbursement "in any way" from First Jersey. (In its cover letter accompanying this *in camera* submission, the government explained that Lefauve subsequently admitted in an inter-

view that Spangler had lent him $1000 but that he had not repaid the loan.)

*Walter Grenda:* initially denied having received a check either shortly before or after making the political contribution; later testified that Spangler had extended him a loan but that he did not intend to repay it because he was "dissatisfied" with First Jersey, that he has not listed the Spangler loan as outstanding indebtedness on subsequent bank loan applications, and that no money was withheld from his final paycheck from First Jersey even though it had been more than sufficient to satisfy that debt.

*Richard Heidt:* testified that when making the loan, Spangler said Heidt could repay it when he was able to make $10,000 per month in commissions; believed that the conditions for repayment were unrealistically favorable to him because he doubted that his income would ever reach that level; could not recall anyone else either being offered or receiving a loan; stated that Spangler later forgave the loan debt in a notation made in a birthday card; referred to the loan several times as a gift and to Spangler as a very generous man; and, stated that Valentine had no reason to lie before the grand jury because he was a fan of neither Brennan nor Spangler.

With full knowledge of this testimony, the government nevertheless pursued at trial a strategy of placing in evidence, over defendant's objection, fifteen $1000 checks and arguing to the jury that Valentine must have committed perjury in denying he had received a loan from Spangler because there was a consistent pattern of loans made to other brokers. The discrepant grand jury testimony set forth above, however, significantly disrupts any pretense of consistency. All told, three brokers testified unequivocally to having received loans; three brokers testified to having received loans that they did not intend to repay and, therefore, might reasonably be considered gifts; two brokers testified to having received gifts; and two brokers, Valentine and Stowell, denied receiving either a gift or a loan.

We have previously stated that reversing a criminal conviction for prosecutorial misconduct is a drastic remedy that courts generally are reluctant to implement. *See, e.g., United States v. Biasucci,* 786 F.2d 504, 514 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986); *United States v. Modica,* 663 F.2d 1173, 1183–84 (2d Cir.1981) (per curiam), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). However, when a prosecutor's tactics cause substantial prejudice to the defendant and thereby serve to deprive him of his right to a fair trial, reversal is mandated. *See Biasucci,* 786 F.2d at 514; *United States v. Clark,* 613 F.2d 391, 405 (2d Cir.1979), *cert. denied,* 449 U.S. 820, 101 S.Ct. 78, 66 L.Ed.2d 22 (1980); *United States v. Burse,* 531 F.2d 1151, 1153–54 (2d Cir.1976); *United States v. Drummond,* 481 F.2d 62, 64 (2d Cir. 1973).

We look at three factors to determine whether prosecutorial misconduct caused the accused substantial prejudice: the severity of the misconduct; the measures adopted to cure the effects of the misconduct; and the certainty of conviction in its absence. *Modica,* 663 F.2d at 1181.

In analyzing severity, among the elements to consider is the "extent to which the misconduct was intentional". *Id. See United States v. Universita,* 298 F.2d 365, 367 (2d Cir.) ("The prosecutor has a special duty not to mislead; the government should, of course, never make affirmative statements contrary to what it knows to be the truth."), *cert. denied,* 370 U.S. 950, 82 S.Ct. 1598, 8 L.Ed.2d 816 (1962). The government cannot properly, either explicitly or implicitly, mischaracterize the substance of grand jury testimony. Here, the prosecutor's repeated statements or implications that all of the broker nonwitnesses who received checks received loans were contrary to the grand jury testimony of four such brokers. This violated the due process prohibition against a prosecutor's making "knowing use of false evidence", including by misrepresenting the nature of nontestimonial evidence. *Miller v. Pate,* 386 U.S. 1, 6–7, 87 S.Ct. 785, 787–788, 17

L.Ed.2d 690 (1967); *see also Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); *United States v. Lusterino,* 450 F.2d 572, 574–75 (2d Cir. 1971).

■ The trial court's dismissal of the gift theory specification on Valentine's rule 29 motion was insufficient to cure the ultimate ill effects of the prosecutor's misrepresentation of the other brokers' testimony. Had the government presented the full picture, with all its complexities and variations, Judge Sweet, rather than dismiss the gift theory specification on Valentine's rule 29 motion, might well have submitted both theories to the trial jury for it to decide, on the conflicting evidence, whether the government had proven its case on either theory. Removing the gift theory specification from the trial jury's consideration, however, actually proved a disservice to Valentine by overemphasizing the strength and breadth of the loan theory, and by precluding the jury from considering that because other brokers had ascribed various labels to the Spangler payment, perhaps Valentine did not testify falsely before the grand jury in denying his payment from Spangler was a loan. Judge Sweet could not have grasped the full measure of detriment caused by the government's trial strategy without reviewing the grand jury record; we will not speculate as to why the grand jury transcripts were not filed under seal as directed below. For our purpose it suffices that the prosecutor's presentation gave the trial jury an unfair and inaccurate impression that documentary evidence and oral testimony uniformly substantiated the government's loan theory of culpability.

Finally, because of the prosecutor's "consistent pattern" argument, at best questionable and perhaps outrightly disingenuous, our confidence in the jury verdict is severely shaken. If Valentine had presented the substance of the grand jury testimony summarized above after the gift theory specification had been removed from the jury's consideration, a conviction under the loan theory would have been far from certain.

This case is not of the sort wherein, due to the length of the trial or the overwhelming weight of the evidence, the improper conduct of the prosecutor can be disregarded. *See, e.g., Biasucci,* 786 F.2d at 514; *United States v. Terry,* 702 F.2d 299, 313 (2d Cir.), *cert. denied,* 464 U.S. 992, 104 S.Ct. 482, 78 L.Ed.2d 680 *and* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Barlin,* 686 F.2d 81, 93 (2d Cir.1982); *Modica,* 663 F.2d at 1182. Because the error was of constitutional dimension, the case was close, and the misrepresentation was emphasized in the prosecutor's summation, this error, even standing alone, was not harmless. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *cf. United States v. Peterson,* 808 F.2d 969, 976 (2d Cir.1987).

■ Although there was no objection, we may reverse under Fed.R.Crim.P. 51 ("if a party has no opportunity to object to a ruling or order, the absence of an objection does not thereafter prejudice him"). We have held that where the government relies on grand jury testimony, defense counsel should not be penalized for failure to object based on a ground not known to him. *United States v. Tramunti,* 500 F.2d 1334, 1341 & n. 3 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974). "We cannot expect clairvoyance on the part of defense counsel." *Id.* at 1341; *see United States v. Douglas,* 155 F.2d 894, 896 (7th Cir.1946) (objection not necessary to preserve error for appeal when defense counsel has no knowledge of facts showing violation). Here, Valentine's counsel apparently had no knowledge that the prosecutor was misrepresenting the grand jury testimony of at least two of the nonwitness brokers, and some knowledge of the misrepresentations as to two others. While Valentine failed to take advantage of his access to these brokers, this failure does not allow the prosecutor to make misrepresentations. We do not reach the question of whether the prosecutor's conduct also offended the standards established by *Brady v. Maryland* and its progeny.

Since there may be a retrial, we offer some guidance to the district court on issues that may arise again. Valentine contends it was improper for the government to argue on summation that Valentine must have remembered receiving a loan because the other brokers recalled their transactions with Spangler. We agree. However, a more objectively phrased statement, indicating, for instance, that the events surrounding the solicitation of Bell campaign contributions were unusual and memorable, would be permissible.

Secondly, we conclude that Judge Sweet did not abuse his discretion in allowing the government to present evidence of Spangler's conversations with other brokers as being relevant under Fed.R.Evid. 401, not unfairly prejudicial under rule 403, and admissible, under rule 803(3), to show Spangler's plan or intent to finance the brokers' campaign contributions. *See United States v. Badalamenti*, 794 F.2d 821, 825–26 (2d Cir.1986). The admissibility of the checks, however, is more problematic. Grand jury testimony discloses that the transactions from which those checks arose were far from uniform. Accordingly, before each check can be admitted into evidence there should be some foundation testimony to indicate whether the check represents a loan, a gift, or some combination thereof.

Finally, Valentine contends that his April 17, 1986, grand jury testimony should have been suppressed pursuant to the court's supervisory power, because the government did not comply with Justice Department guidelines and warn Valentine that he was a target of a perjury investigation. Judge Sweet ruled that Valentine should have received a target warning, but declined to suppress the testimony because Valentine failed to show a constitutional deprivation. On each grand jury appearance, Valentine was advised of his constitutional right against compelled self-incrimination, and his right to consult with counsel. On his January 16 appearance, Valentine received an explanation of the penalties for perjury, and on April 17 was afforded an opportunity to change any of his testimony and was advised of his right to recant under 18 U.S.C. § 1623(d). In short, because Valentine had no constitutional right to receive a target warning, *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1976), and was otherwise well advised of his constitutional and statutory rights, we conclude Judge Sweet properly declined to suppress his April 17 grand jury testimony.

Our disposition of this appeal renders unnecessary any consideration of Valentine's claim of insufficient, or, in the alternative, inherently contradictory, evidence. We have carefully considered Valentine's remaining claims, and find them to be without merit.

Reversed and remanded for a new trial.