**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Julius ALLI, Defendant–Appellant.**

**No. 02–50029.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 3, 2003.

Filed Sept. 22, 2003.

Gerald M. Serlin, Benedon & Serlin, Woodland Hills, CA, for the defendant-appellant.

Elena J. Duarte, Assistant United States Attorney, Office of the United States Attorney, Los Angeles, CA, for the plaintiff-appellee.

Before FERGUSON, HALL, and BERZON, Circuit Judges.

## OPINION

BERZON, Circuit Judge.

Julius Alli was convicted for his participation in a tax fraud scheme. Although the scheme netted him no more than a few

thousand dollars, he was sentenced to seventy-one months in federal custody, three years of supervised release, restitution of $38,500, and a $250 special assessment.

Alli appeals his conviction and sentence. His central and most troublesome contention concerns testimony by two of Alli's partners-in-crime who testified for the government at the trial. Both were less than truthful initially regarding their expectations of leniency from the government in exchange for their testimony. Alli contends that the prosecutor violated his right to due process by failing promptly to bring to light the misstatements of the two witnesses. In addition, Alli seeks correction of a technical error the district court made in sentencing. We affirm Alli's conviction but remand for resentencing.

## I

Alli was convicted after a jury trial of one count of conspiracy against the United States pursuant to 18 U.S.C. § 371. He was also convicted of four counts of making false, fictitious, and fraudulent claims upon the United States under 18 U.S.C. § 287.

Alli and his co-conspirators filed fraudulent tax returns claiming refundable tax credits, such as earned income credits and fuel tax credits, using their own names and social security numbers and those of unsuspecting individuals. Thirty-two fraudulent tax returns were introduced at trial. Some of the returns directed payment to Alli's residence, others to mailboxes in Los Angeles and Phoenix. Alli's wife obtained some of the names and social security numbers through her work at the Los Angeles Department of Children and Family Services, from information on the agency's database. The signature dates on several of the implicated tax returns indicate that the scheme began as early as February 1994.

The Internal Revenue Service ("IRS") first contacted Alli because its agents thought he might have been a victim of an illegal scheme. His tax return contained a fraudulent fuel tax credit and earned income tax credit. Alli claimed at the time that he had never seen the return and that the name and number were that of his brother, coincidentally also named Julius. At trial, it turned out that Alli's brother is actually named Phillip, and that Phillip's writing and fingerprints appear on none of the returns.

Substantial evidence was presented at trial indicating that Alli was involved in the scheme. Using handwriting matches, a government expert found that seventeen of the thirty-two tax returns introduced as evidence were filled out by Alli. Alli's fingerprints were also found on his own tax return and that of two others involved in the conspiracy. Several of the returns used Alli's name or home address. Alli's signature also appeared on an application for one of the mail drops used in the scheme.

At trial several witnesses testified for the government. One government witness, Ezekial Oyegoke, was a co-conspirator in the tax fraud scheme who had confessed to involvement in the plot. Oyegoke testified that another co-conspirator, Samuel Aragbaye, told him that Aragbaye and Alli were going to Phoenix to open mailboxes for "tax purposes."

In response to defense questioning, Oyegoke at first acknowledged that he was cooperating with the government and had entered a plea agreement but stated that he had not been promised any sentencing benefits as part of the agreement. After defense counsel refreshed Oyegoke's recollection by showing him the plea agreement, Oyegoke admitted that his ultimate sentence would be based in part on his

testimony at trial.[1] He also admitted that he had lied to law enforcement about his involvement in the scheme when initially interviewed but maintained that he was telling the truth in court. Defense counsel never moved to admit the plea agreement into evidence, nor did he move, on the basis of Oyegoke's trial testimony, to dismiss the indictment or for a new trial.

Emmanuel Ogunde also testified on behalf of the government pursuant to a plea agreement. Ogunde testified that he collected names for use on the fraudulent tax returns both from Aragbaye and from Alli's wife via Alli.

Like Oyegoke, Ogunde initially had lied to law enforcement. Also like Oyegoke, Ogunde testified when asked that he had not been promised a reduction in his sentence for cooperation. Defense counsel showed him his plea agreement and highlighted the fact that a reduction in sentence might be recommended if his testimony was helpful to the government.[2] But Ogunde never admitted that he could receive a benefit for his testimony. Again, defense counsel did not introduce the plea agreement into evidence and did not move for a new trial or dismissal.

Alli did not testify at trial. He called only three witnesses. The first, Olyuya Kuku, testified that Ogunde told him that he "would get" and "punish" Alli because Alli's wife had kicked him out of her house. The second defense witness, Bernadette Akitoye, recounted that Ogunde told her that he would do anything in his power to "put [Alli] in trouble."

Finally, the defense called Alli's brother Phillip. At the time of trial, Phillip was in custody as a result of a fraud conviction in Arizona. Phillip confessed to the crimes for which Alli was on trial. Unfortunately for Alli, Phillip did not know enough about

---

1. On cross-examination, Oyegoke testified:

   Q: Did you negotiate with the government as part of your plea bargain, a provision that if you cooperate with the I.R.S., that at sentencing, the prosecutors will recommend a lower sentence for you.
   A: No. They don't say that.
   Q: That doesn't appear anywhere in the plea agreement?
   A: No.
   * * *
   Q: Would it refresh your recollection if I let you read about 10 or 11 lines in your plea agreement?
   A: I appreciate it.
   * * * [Oyegoke reviewing plea agreement]
   Q: Now, I will ask you again, Mr. Oyegoke, is there anything in your plea agreement that provides that if you cooperate with the government in prosecuting others, that that will benefit you at sentencing?
   A: Yes.

2. On cross-examination, Ogunde testified:

   Q: And you knew that as a result of cooperating, that your sentence could be lowered; correct?
   A: I didn't know that.

   * * *
   Q: If I show you a paragraph from [the agreement], would it perhaps refresh your recollection as to whether you had an obligation to cooperate and what you'd get for that? . . .
   A: Yes.
   * * *
   Q: Okay. Now, does reading this page refresh your recollection as to what your agreement was with the government about what you get, if anything, for cooperating?
   A: It didn't explain that.
   Q: Didn't explain it, or your lawyer didn't explain it to you?
   A: No, I read it, but I mean—
   Q: But you don't understand it?
   A: (Pause.)
   Q: You are facing up to 33 years in prison and you don't know whether or not you are going to get rewarded for coming to court and pointing the finger at other people?
   A: I am not pointing a finger, not at people, sir.

the scheme to testify about any details of it. Most tellingly, Phillip could not say what was false about the returns and what credits were claimed, and he denied that he opened mail drops or filed tax returns under his brother's name or under any of the aliases used. Phillip also admitted to having given many prior inconsistent statements to the U.S. Attorney. Finally, Phillip's fingerprints did not match those on any of the returns involved in the scheme.

In closing arguments, the prosecution did not rely on the testimony of either Oyegoke or Ogunde, stressing that there was sufficient evidence without that testimony to indicate that Alli had perpetrated the fraud. The prosecution further reminded the jury that Oyegoke and Ogunde were "fraudsters" and "cooperating witnesses" for the government. Defense counsel also cautioned the jury to disregard the testimony of Oyegoke and Ogunde if the jurors thought the witnesses had been untruthful. At the close of the trial, the judge submitted instructions to the jurors reminding them that Oyegoke and Ogunde had testified pursuant to plea agreements and that their testimony therefore should be treated with "greater caution than that of ordinary witnesses."

The presentence report calculated a Sentencing Guidelines range of fifty-seven to seventy-one months, based on a total offense level of twenty-three and a criminal history category of three. The probation officer recommended enhancements for sophisticated concealment, pursuant to U.S. Sentencing Guidelines § 2T1.4(b)(2), and obstruction of justice, pursuant to § 3C1.1. Alli had a prior conviction for making a false statement, which earned him two criminal history points pursuant to Sentencing Guidelines §§ 4A1.1(b) and 4A1.2(e)(2). Because Alli "had participated in the instant offense as early as Febru-

ary 8, 1994," while still under probation, two more criminal history points were added pursuant to section 4A1.1(d).

At sentencing, Alli objected to the loss amount, the sophisticated concealment and obstruction of justice enhancements, and the criminal history category. There was no objection during or before the sentencing based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). The district court overruled Alli's objections to the enhancements. The court also declined to exercise its discretion to depart downward in the criminal history category because of the prior conviction's age and the fact that the defendant had nearly completed probation at the time of his current offense.

When sentencing the defendant, the court specified that the seventy-one months applied to "each of Counts I through V of the Indictment [are] to be served concurrently." After the fact, the district court discovered that it had erroneously sentenced Alli to seventy-one months for a crime that had a statutory maximum of five years (sixty months). By the time the judge realized his mistake, however, the seven days during which he could have corrected the error had passed.

## II

### A. *False Testimony*

■ Alli argues that his constitutional right to due process was violated when the prosecutor failed to correct the false testimony of two government witnesses, Oyegoke and Ogunde. "If a prosecutor knowingly uses perjured testimony or knowingly fails to disclose that testimony is false, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury verdict." *United States v. Cooper*, 173 F.3d 1192, 1203 (9th Cir.1999) (quota-

tion marks and citation omitted). As there was no objection below to the prosecution's failure to correct the testimony of these two witnesses even though defense counsel knew the true facts, this court can only review for plain error. *Id.; see also United States v. Blueford,* 312 F.3d 962, 974 (9th Cir.2002).

Neither witness initially admitted that his plea agreement provided that the government could move to reduce his sentence in return for his testimony against Alli. Alli's attorney, however, had the agreements, as the government had disclosed them during discovery. In each instance of testimony, following the witness's initial denial Alli's attorney immediately used the plea agreement to try to refresh the witness's recollection and thereby impeach his credibility.

After reviewing the relevant section of the plea agreement, Oyegoke admitted that his cooperation with the government in prosecuting others could benefit him at sentencing. Alli's attorney was less effective in eliciting a clear response from Ogunde, who appeared not to understand the contents of his agreement.

■ Despite defense counsel's efforts on cross-examination, the government had an independent obligation immediately to take steps to correct known misstatements of its witnesses. *United States v. LaPage,* 231 F.3d 488, 492 (9th Cir.2000). This obligation obtained even though the government did not solicit the false testimony and the false testimony went only to the credibility of the witness, not to substantive evidence. *Napue v. Illinois,* 360 U.S. 264, 269–70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The scope of this duty reflects the prosecution's fundamental responsibility to promote justice, fairness, and truth, rather than simply to win. *See Blueford,* 312 F.3d at 968.

■ Furthermore, "the government's duty to correct perjury by its witnesses is not discharged merely because defense counsel knows, and the jury may figure out, that the testimony is false." *LaPage,* 231 F.3d at 492. The prosecutor could have requested, for example, a bench conference with the judge and defense counsel to decide how best to inform the jury that both Oyegoke and Ogunde might receive benefits at sentencing for testifying against Alli. *See id.* Instead, the prosecutor did nothing at all to correct the witnesses' misstatements concerning the possibility of sentencing benefits in exchange for testimony favorable to the government.

■ We conclude, nonetheless, that the government's breach of its duty of candor does not constitute plain error. Under the plain error standard, the defendant must show that (1) there was error; (2) the error was "plain"; and (3) the error affected "substantial rights." *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). If such a finding is made, this court is still not required to reverse unless the error "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Cooper,* 173 F.3d at 1203 (quotation marks and citations omitted).

Although the other plain error standards are met here, including potential impact on the "public reputation of judicial proceedings," the error here simply did not affect Alli's substantial rights. Alli's attorney had the plea agreements and used them in cross-examining the witnesses. During cross-examination, Oyegoke admitted the benefits of his plea agreement. The jury heard defense counsel refer to and characterize both witnesses' plea agreements. Oyegoke's false testimony was therefore corrected, while the jury was left with the clear impression that Ogunde had a similar agreement.

Watching defense counsel gain the concessions from Oyegoke could have made a more dramatic impact on the jury than a bland acknowledgment by the government of its discretion to ask for a reduced sentence.

Also, the defense attorney could have introduced the plea agreements but did not. This lapse suggests that Alli's lawyer may have made the tactical judgment that a graphic illustration of the witnesses' unreliability was worth more to the defense than informing the jury of the truth in any detail, and he may have been right.

■ In addition, the prosecutor never sought to capitalize on the false testimony. In closing arguments, the prosecutor told the jury that "Mr. Ogunde and Mr. Oyegoke are fraudsters. They are criminals. *They are cooperating witnesses.* They are involved in fraud." (emphasis added). Far from bolstering the witnesses' credibility, the prosecutor encouraged the jury to rely on other evidence presented against Alli, emphasizing that there was sufficient evidence to convict Alli without Oyegoke's and Ogunde's testimony.[3]

Moreover, there was ample evidence in the record to convict Alli including (1) Alli's fingerprints found on his own tax return and on two other returns; (2) the testimony of the government's handwriting expert; (3) Alli's name and home address used on several of the returns; and (4) Alli's signature on one of the applications for the mail drops used in the scheme. Finally, the judge specifically instructed the jurors that Oyegoke and Ogunde had testified pursuant to plea agreements and that their testimony should therefore be treated with "greater caution than that of ordinary witnesses." In short, there is no doubt that the jury was aware that Oyegoke and Ogunde were beneficiaries of plea bargains and that their testimony was of dubious reliability.

■ Given all the circumstances, this is the relatively rare case in which the defendant cannot establish that the government's failure to correct false testimony affected the defendant's substantial rights. To the contrary, it is considerably more likely than not that the jury gave the two cooperating witnesses' testimony little or no weight.

In the end, then, the outcome of this case turns on the critical facts that: the defense attorney had the agreements; used them to cross-examine the witnesses; decided not to introduce them into evidence; and neglected to object to the misstatements of the witnesses.[4] If Alli had been unable to object below because he did not know the true facts, the standard of review would have been different from plain error, and the result in this case would almost surely be otherwise. *See*

3. The prosecutor did not recite Oyegoke's or Ogunde's testimony at all. Instead, he said:

> I could tell you why these witnesses should be believed. Mr. Werksman could tell you why they shouldn't. But I submit to you that there is an easier way. And the way is, if you are uncomfortable with those witnesses, put them aside just for a minute. Put them aside when you go back in the jury room. And talk about the evidence that was presented to you in the absence of those witnesses.
>
> And you will see, ladies and gentlemen, I submit to you that even without—I'm not

> saying you should do this for any reason other than your own comfort—even without the testimony of those two cooperators, the government, the evidence, has proven to you beyond a reasonable doubt the counts charged.

4. As we apply the plain error standard, we need not decide whether the result would have been the same even if Alli had objected below—that is, whether there is a "reasonable likelihood that the false testimony could have affected the jury verdict." *Cooper,* 173 F.3d at 1203 (citation omitted).

*Blueford,* 312 F.3d at 973–76. As it is, though, we must affirm the conviction despite the prosecutor's failure to correct the false testimony when given.

### B. *District Court Sentence*

■ The district court recognized, and all parties agree, that the sentence cannot stand. The district court imposed a seventy-one month sentence on each of counts one through five, to be served concurrently. The statutory maximum for each count, however, is five years (sixty months). 18 U.S.C. §§ 287, 371.

Alli also contests the sentencing enhancements approved by the district court. The district court included a two-point increase in his criminal history because he "committed the instant offense while under [a] criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." U.S. Sentencing Guidelines Manual § 4A1.1(d). At the time of sentencing, Alli was still on probation for a prior crime, the making of a false statement. The presentence report stated that Alli participated in the tax fraud scheme as early as February 8, 1994. Alli was on probation until March 22, 1994 for the false statement offense and thus qualified for the section 4A1.1(d) enhancement.

■ Alli maintains, however, that the district court's finding regarding the starting date of the conspiracy was wrong. This court must defer to the district court's findings of fact in determining sentencing enhancements absent a showing of clear error. *See United States v. Williams,* 291 F.3d 1180, 1191, 1196 (9th Cir.2002).

■ There are several pieces of evidence in the record upon which the district court could have relied for its finding regarding the starting date of the offense. Four of the fraudulent tax returns that formed the basis for the four substantive counts were signed and dated before March 22, 1994. While Alli maintains that the February 8, 1994 date was garnered from an IRS tax return not filed until March 14, 1994, even on that date Alli was still on probation. Also, the disputed return was signed and dated February 8, 1994. Although the return was not *filed* until March 14th, the signing and dating of a false return furthered the tax fraud conspiracy.

In short, no matter which of the pertinent dates one chooses as the start date of the conspiracy, Alli was on probation on that date. The district court thus properly applied the section 4A1.1(d) sentencing enhancement.

Finally, Alli contends that his sentence violates *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348, because certain upward adjustments under the sentencing guidelines increased his sentence, yet the underlying facts were not submitted to the jury. This court has repeatedly held that *Apprendi* does not apply to guidelines enhancements where the sentence imposed is within the statutory maximum. *United States v. Hernandez–Guardado,* 228 F.3d 1017, 1027 (9th Cir.2000). Assuming correction of the sentencing error on remand to bring the sentences on each count within the five-year statutory maximum, there is no *Apprendi* error. *See United States v. Gamez,* 301 F.3d 1138, 1145 n. 4, 1149–50 (9th Cir.2002) (treating statutory maximum on multiple counts as total of statutory maximums).

We AFFIRM in part and REMAND to the district court for resentencing consistent with this decision.